Valentine Boris CZUBAROFF

v.

James R. SCHLESINGER, Secretary of Defense of the United States, et al.

Civ. A. No. 73–1148.

United States District Court,
E. D. Pennsylvania.

Nov. 7, 1974.

Alan M. Lerner, Philadelphia, Pa., for plaintiff.

Robert deLuca, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

HANNUM, District Judge.

Petitioner, Dr. Valentine B. Czubaroff, seeks a writ of habeas corpus to compel

his release from the United States Navy as a conscientious objector.[1]

## FACTS

Dr. Czubaroff was graduated from Tufts University in June of 1965, and from Tufts University Medical School in June of 1969. During his last year of medical school, Dr. Czubaroff voluntarily enlisted in the United States Navy pursuant to the Berry Plan. The Berry Plan "is a military program made available to medical students which permits them to join the [Navy Reserve] as commissioned officers and to postpone active duty until medical studies are completed." Nurnberg v. Froehlke, 489 F.2d 843, 845 (2nd Cir. 1973).

Following medical school Dr. Czubaroff (Lt. USN-R) served his medical internship at the Boston City Hospital until June of 1970. Thereafter he began his residency program at the University of Pennsylvania Hospital. On October 4, 1972, Dr. Czubaroff filed a formal application for discharge as a conscientious objector.[2] The application was processed pursuant to Navy regulations. Accordingly, Dr. Czubaroff was interviewed by a Navy psychiatrist, Dr. Patrick Kamm, a Chaplain designated by the Navy, Charles Bechel, and an investigating officer, LCDR. Jack Kirbey, each of whom filed a report containing a recommendation of acceptance or denial of the application.[3] These reports were submitted to the Commandant, Fourth Naval District, who in turn made his own recommendation.[4] The entire file with reports and recommendations was then forwarded to the Chief of Naval Personnel for final resolution.

On March 7, 1973, Dr. Czubaroff received from the Navy orders to report for active duty at the Philadelphia Naval Hospital on or before July 9, 1973.

On or about May 17, 1973, Dr. Czubaroff was advised by the Chief of Navy Personnel that his application for discharge as a conscientious objector was denied.

To forestall induction to active duty, Dr. Czubaroff filed on May 22, 1973, a petition for writ of habeas corpus. On July 5, 1973, this Court entered a temporary restraining order blocking induction. The Order was continued, pending receipt of the official record, until final disposition.

## SCOPE OF REVIEW

Our review of military determinations made by an official or review board is limited to whether there is a

1. The power to hear this habeas corpus petition is granted to federal district courts by 28 U.S.C. § 2241. The petitioner meets the requirements set forth therein: Schlanger v. Seamans, 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (1970); Strait v. Laird, 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972).

2. Although destined to serve as a medical officer, Dr. Czubaroff refused even this noncombatant role. His reasoning is as follows: "For, to be a non-combatant member of the military or its affiliates is still to be supportive of the military organization." Appendix B page 737.

3. Dr. Kamm concluded: "In my psychiatric opinion I believe Dr. Czubaroff is sincere in his beliefs." Chaplain Bechel concluded: "He appears sincere and committed to his philosophy and I therefore recommend his application be approved."

LCDR Kirbey concluded: ". . . the applicant has met the test of sincerity; nevertheless, he has chosen not to express the same until it was necessary for him to so do. The integrity of the applicant appears to this hearing officer to be the basis for not recommending 1-0 status. Based upon the application itself and the letters supporting Lt. Czubaroff's application, it would appear that his views crystallized sometime ago, but it was neither convenient nor appropriate for him to express them until now, insofar as his military obligation is concerned."

4. Commandant, Fourth Naval District concluded: "It is my opinion that the application is not bona fide, nor is it based upon deep sincerity. It appears that the applicant voluntarily joined the Berry Plan, intending to use it as a vehicle to best serve his own interests without due consideration to the commitment he made therein."

basis in fact in the record for the military determination. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1945).[5]

■ In the instant case, the Navy determined that Dr. Czubaroff's conscientious objector beliefs crystallized when he was in medical school or earlier, which, in any event, was prior to his enlistment in the United States Navy. On this basis the Navy denied the application for discharge. The authority for this denial is Navy Regulation BUPERS-MAN 1860120 which provides that a request for discharge based solely on conscientious objection which existed but was not claimed prior to induction or enlistment shall not be considered. In other words, if one is a bona fide conscientious objector and nevertheless enlists in the Navy, the right to thereafter seek a discharge on conscientious objector grounds is waived. Thus, the Navy's denial, if there is any basis in fact in the record to support it, is inescapable. Moreover, the Navy's denial, if there is any basis in fact to support it, must be upheld.

■ This Court is mindful that it must not act as a superboard; the weight or substantiality of the evidence is not for our evaluation. Witmer v. United States, 348 U.S. 375, 380–381, 75 S.Ct. 392, 99 L.Ed. 428 (1955). Nevertheless, there must be some facts— hard, provable, reliable facts—that provide a basis for the Navy's determination. Helwick v. Laird, 438 F.2d 959, 963 (5th Cir. 1971).

## ISSUE

In view of the foregoing, the issue before the Court is whether there is a basis in fact in the record for the Navy's determination that Dr. Czubaroff's conscientious objector beliefs crystallized

prior to his enlistment in the United States Navy?

## DISCUSSION

■ We acknowledge at the outset the great difficulty faced by the Navy in determining when an individual's views on a serious subject crystallize. A determination which must be deducted · from an admittedly "imprecise psychological process." Goodwin v. Laird, 317 F.Supp. 863, 866 (N.D.Cal.1970).

Nevertheless, we begin our review of the Bureau of Naval Personnel's denial of Dr. Czubaroff's application for discharge as a conscientious objector to see if there is any basis in fact in the record for the denial.

The Bureau of Navy Personnel assigned three reasons for the denial:[6] (1) the recommendation of the Commandant, Fourth Naval District that the application be denied; (2) the recommendation of the investigating officer that the application be denied; (3) Dr. Czubaroff's application for discharge.

■ The recommendation by the Commandant, Fourth Naval District is insufficient on its face since it is not supported by reference to any facts in the record at all. At best it is based on an impression of the application; an impression which clearly fails to satisfy the basis in fact requirement; and which, therefore, cannot be a basis on which to deny the application.

■ The recommendation by the investigating officer LCDR Kirbey, concluded that Dr. Czubaroff's "views crystallized some time ago." However, earlier in the same report Kirbey stated: "It appears that Lt. Czubaroff's internship and psychiatry residency were the formative years when the views, more or less, crystallized regarding the position he takes as a conscientious objector."

5. See, Bohnert v. Faulkner, 438 F.2d 747 (6th Cir. 1971); United States ex rel. Donham v. Resor, 436 F.2d 751 (2nd Cir. 1971); United States ex rel. Conrad v. Huffman, 435 F.2d 1273 (7th Cir. 1970); Packard v. Rollins, 422 F.2d 525 (8th Cir.

1970); Koster v. Sharp, 303 F.Supp. 837 (E.D.Pa.1969); cf. United States ex rel. Lehman v. Laird, 430 F.2d 96 (4th Cir. 1970).

6. See generally Appendix A.

This latter observation is mutually exclusive with Kirbey's conclusion that Dr. Czubaroff's conscientious objector beliefs crystallized ante-enlistment. In fact, a fair reading of this latter observation would more properly indicate that Dr. Czubaroff's beliefs had crystallized *after* his enlistment. From this inherent contradiction in Kirbey's report, we conclude that it can provide no factual basis whatsoever for the Navy's decision to deny Dr. Czubaroff's application for discharge.

The final reason assigned by the Navy for denial of the application is based on the Navy's analysis of the application itself.[7] The Chief of Naval Personnel concluded that "by your own admission at three or more points in your application . . . your alleged beliefs existed while you were in medical school or earlier and before you applied for the Berry Plan . . . ." The Chief of Naval Personnel's report supports this conclusion by specific reference to four passages in Dr. Czubaroff's application. Because of their significance, we quote each in its entirety:

"Of course, I had learned at home, and had always felt that (sic) horror and opposition to physical violence and war, but it took my immediate confrontation with human suffering on the hospital wards, and my potential involvement in an actual war situation for my views on the opposition to war to crystallize.

Finally, when my medical school graduation was imminent, I, as did most of my friends, applied for a Berry Plan deferment, in the hope of putting off military service in Vietnam for another four years. This action, in a way, gave me another four years before I had to seriously confront the conflicts I felt between my own personal beliefs and values and those of the military institution.

As I began to think seriously about these issues, I found that my long standing opposition to war extended to a strong repugnance for the whole idea of a military organization.

My beliefs were not fully crystallized until my college and medical years."

Before examining these passages to determine whether any or all provide a basis in fact for the Navy's denial, we note the inherent problems in "lifting" quotations from a lengthy discourse. Because the military board must assign reasons for their decision, this technique is to some extent necessary. Therefore, in fairness to both sides, we shall examine the quotations individually and contextually.

The first quotation reveals that Dr. Czubaroff always felt some opposition to war and this opposition crystallized with his confrontation with human suffering in the hosptial wards and his potential involvement in a war situation.

It is well-settled that the test for determining conscientious objector status is not whether one is "opposed to all wars, but whether [one] is opposed . . . to *participation* in war." Sicurella v. United States, 348 U.S. 385, 390, 75 S.Ct. 403, 406, 99 L.Ed. 436 (1955). (original emphasis). It follows therefrom that since opposition to war cannot prove conscientious objector status, neither can the crystallization of that opposition provide a factual basis for the Navy's denial. Thus we conclude that the first quotation provides no basis in fact on which to deny Dr. Czubaroff's application for discharge.

The second quotation appears to be an admission by Dr. Czubaroff that he applied for the Berry Plan without seriously considering the consequences. It may be naive and insincere of a well-educated man to make a decision of this significance without reflection, but maturity and sincerity are not here at issue. The issue is whether this statement provides a basis in fact for a finding that Dr. Czubaroff's conscientious objector be-

---

7. See generally Appendix B.

liefs crystallized prior to enlistment. Clearly it cannot. The words themselves refute such a conclusion. In fact, the converse is more properly deducted: that Dr. Czubaroff did not resolve the "conflict" in his mind until after enlistment. A reading of the entire application supports this conclusion. Neither then can the second quotation provide a basis for the Navy's denial.

The third quotation finally links Dr. Czubaroff's opposition to war and his "inability" to participate in a military organization. The question is, of course, when did he begin "to think seriously about these issues." The preceding sentence provides the answer: "Once this four year grace period was assured, and once the academic pressures of medical school diminished, I was able to devote more time . . . to learning about . . . war . . . and about the military organization. . . . "

Thus, there is no doubt but that, according to the above statement, Dr. Czubaroff began to think seriously about these issues only after his enlistment. Therefore, this quotation, examined in context, provides no basis in fact for the denial.

The final quotation recites that Dr. Czubaroff's "beliefs" crystallized in his college and medical years. Apart from what is meant by "medical years," serious question arises as to what is meant by the word "beliefs." An examination of the word "beliefs" in context shows that it refers back, in the preceding sentence, to the word "humanism." [8] To conclude therefrom that Dr. Czubaroff was a conscientious objector prior to enlistment simply because he was a humanist in college offends both logic and common sense. At any rate, it is not a conclusion which is based on the hard, provable, reliable facts that is required. Thus, careful not to substitute our judgment on the weight of the evidence for that of the military board, Witmer v. United States, 348 U.S. 375, 380–381, 75 S.Ct. 392, 99 L.Ed. 428 (1955), we conclude that this quotation provides no evidence, no basis in fact, for the Navy's denial of the application.

 For all of the foregoing reasons we conclude that this report by the Chief of Naval Personnel contains no basis in fact on which to deny Dr. Czubaroff's application for discharge.[9] We are mindful that if there is any objective evidence, even though not predominant or substantial, the finding of the Navy must be sustained. United States ex rel. Donham v. Resor, 436 F.2d 751 (2nd Cir. 1971). In this regard, we have examined the entire administrative record and we find no basis in fact for the Navy's denial of Dr. Czubaroff's applica-

---

**8.** The Oxford English Dictionary defines "humanism" as: (1) Any system of thought or action which is concerned with merely human interests (as distinguished from divine), or with those of the human race in general (as distinguished from individual); (2) Devotion to those studies which promote human culture; literary culture; *esp.* the system of the Humanists, the study of the Roman and Greek Classics which came into vogue at the Renaissance.
Dr. Czubaroff volunteers his own definition of "humanism" in Appendix B at page 737: "[A] belief that the ultimate value is not a God, but *man* in the here and now; a belief that man is an animal and as such is part of nature; a belief that through his reason-ing capacity, man shall be able to resolve his human problems; a belief that social freedom is a prerequisite for individuality and autonomy; and, finally, a belief that men in social collectivities, if they respect and care for each other, *must seek to resolve their social conflicts peacefully.*"

**9.** Although irrelevant to our review the clearest statement by Dr. Czubaroff on when his conscientious objector beliefs crystallized is found on page 751 of Appendix B where he states: "It was during the four year grace period that I had as a result of the Berry Plan deferment that *my opposition to violence and war became incompatible with military service in general.*" (emphasis supplied).

tion for discharge as a conscientious objector.

Whether Dr. Czubaroff's conscientious objector beliefs are long-standing or short-lived, sincere or dubious, must be drawn from the record. Whether they are valid or vain is not before us.[10]

Thus, for the foregoing reasons Dr. Czubaroff's petition for a writ of habeas corpus is granted.

## APPENDIX A

### DEPARTMENT OF THE NAVY
### BUREAU OF NAVAL PERSONNEL
### WASHINGTON, D.C. 20370

IN REPLY REFER TO
Pers–F2
Ser 1195F231
15 May 1973

From: Chief of Naval Personnel

To: Lieutenant Valentine B. CZUBAROFF, MC, USNR–R,
108 34 8509/2105
3455 Street Road, Huntingdon Bldg. # 6, Cornwells Heights,
.Pa. 19020

Subj: Your status in the U. S. Naval Reserve

Ref: (a) Your application for conscientious objector status of 4 Oct. 1972
(b) BUPERSMAN 1860120
(c) LCDR Jack A. KIRBY, JAGC, USNR, ltr 03 1900 of 3 Apr. 1973 w/end
(d) Mr. Alan M. Lerner's ltr of 17 Apr. 1973

1. This acknowledges receipt of reference (a) which was your request for classification and discharge in accordance with reference (b). Reference (c) is the report of the investigating officer in your case, and reference (d) is the rebuttal of your attorney to reference (c).

---

10. See footnote 2 supra;
Nevertheless we deem it appropriate to paraphrase from Judge Lawrence's opinion, United States ex rel. Healy v. Beatty, D.C., 300 F.Supp. 843, 850, where he cites a letter written in March, 1862, by Private James Thompson, Eleventh Regiment, Georgia Volunteers, CSA, to his parents in which, in unlettered farm boy style, Private Thompson said:

"Don't Griev or be troubled about me, and as to lying on a soft feather bed i lie just as confortable as i want to. I can take 2 blankets and lie down on a pile of rocks, or in the mud on frozen Ground, or anywhir without anything to shelter with. My Cotrig Box makes a soft pillow, the Mother Earth makes a easy bed, the heavens makes a good shelter, the Lord is a Good general * * * The Great Washington, when hungry and raged, lay on the coald frozen ground without banket, then why not mee be lik Washington. I Glory in the honor and pride of a solgers life. Nothing suits me better. I have Good officers. I love them, thay love mee, and all ways will."

Private Thompson died of smallpox the same year he wrote the above letter. If Dr. Czubaroff had served in the Medical Department of the Confederate Army, would he have violated his beliefs by attending a dying soldier who, if nursed to health, would probably have gone back into action? If smallpox serum had been available, would Dr. Czubaroff have refused to vaccinate because Private Thompson might thereby live to fight another day? All of this seems little short of antihumanitarian. Yet it is precisely where Petitioner's creed logically leads him.

2. During consideration of reference (a), these matters came to the attention of reviewers within the Bureau of Naval Personnel:

 a. In reference (a), you detail the origins of your alleged beliefs in the values you learned at home and in the experiences you had in college and medical school. On page 15.10 of reference (a), you state, "Of course, I had learned at home and had always felt that horror and opposition to physical violence and war, but it took my immediate confrontation with human suffering on the hospital wards, *and my potential involvement in an actual war situation for my views on the opposition to war to crystallize.*" (Emphasis added).

 b. In the next paragraph of reference (a), you state, "Finally, when my medical school graduation was imminent, I, as did most of my friends, applied for a Berry Plan deferment, in the hope of putting off military service in Vietnam for another four years. This action, in a way, gave me another four years before I had to seriously confront the conflicts I felt between my own personal beliefs and values and those of the military institution."

 c. Reference (a) continues to state that your participation in the Berry Plan gave you time to continue your thoughts. You state, "As I began to think seriously about these issues, I found that my *longstanding opposition to war* extended to a strong repugnance for the whole idea of a military organization." (Emphasis added).

 d. On page 15.16 of reference (a), you state again that your ". . . beliefs were not fully crystallized until my college and medical years."

 e. You failed to convince the investigating officer that you meet the criteria set forth in reference (b) for classification and discharge as a conscientious objector. Although he considered you to be sincere in your alleged objection, he found that your beliefs had crystallized prior to the time you entered the Berry Plan, and accordingly, denial of your request was recommended.

 f. You failed to convince the Commandant, Fourth Naval District that you meet the criteria for conscientious objector status. Denial was recommended.

3. The Chief of Naval Personnel considers that you have demonstrated that you do not meet the criteria for classification and discharge as a conscientious objector. Reference (b) states in part that claims for conscientious objector status will not be approved if they are based on alleged beliefs which existed prior to entry. By your own admission at three or more points in your application, the Chief of Naval Personnel is convinced that your alleged beliefs existed while you were in medical school or earlier and before you applied for the Berry Plan, the statements in reference (d) notwithstanding.

4. In view of the foregoing, your application for classification and discharge as a conscientious objector in accordance with reference (b) is denied.

(s) G. H. Rood
G. H. ROOD
Assistant Chief for Performance

FOR OFFICIAL USE ONLY

APPENDIX B

1. Date: October 4, 1972

2. Name: Valentine Boris Czubaroff

3. Social Security No: 108–34–8509

4. Selective Service No: 30–2–44–430

5. Service Address: Inactive Reserves

6. Permanent Home Address: 3455 Street Road
 Huntingdon Bldg., #6
 Cornwells Heights, Pa. 19020

7. Names and Addresses of Schools Attended:

 a) West Islip High School — till June, 1961
 West Islip, New York 11795
 (Public School)

 b) Tufts College — Sept., 1961 — June, 1965
 Medford, Mass. 02155
 (Private College)

 c) Tufts Medical School — Sept., 1965 — June, 1969
 Harrison Avenue
 Boston, Mass.
 (Medical School)

8. Name and Addresses of Jobs:

 a) Boston City Hospital — July, 1969 — June, 1970
 Boston University Medical Service
 Harrison Avenue
 Boston, Mass.
 (As a Medical Intern)

 b) University of Pennsylvania — July, 1970 — Present
 Department of Psychiatry
 Philadelphia, Pa.
 (As a Psychiatry Resident)

9. Former Residences:

 a) 691 Peter Paul Drive — till June, 1967
 West Islip, N.Y. 11795

 b) Castle Square Apartments — June, 1967 — June, 1969
 414 Tremont Street
 Boston, Mass.
 Apartment 71

 c) 17 Winter Street — June, 1969 — June, 1970
 Apartment 32
 Watertown, Mass. 02172

 d) 3455 Street Road — June 1970 — Present
 Huntingdon Bldg., #6
 Cornwells Heights, Pa. 19020

10. Parents Names and Address:

 Father: Boris Czubaroff (Living)
 691 Peter Paul Drive
 West Islip, New York 11795

 Mother: Janina Czubaroff (Living)
 691 Peter Paul Drive
 West Islip, New York 11795

11. Religious Denominations of Parents and Spouse:

 Father: Russian Orthodox

 Mother: Russian Orthodox

 Spouse: Humanist

12. Application for Conscientious Objector Status to Selective Service
 Board? No.

13. Willingness to Perform Civilian Alternative Service:

 I feel I cannot, under any circumstances, perform a social service in an area which is inconsistent with my beliefs. Thus, I will not accept assignment to perform any services within any branch of the military, or its affiliates. For, to be a non-combatant member of the military or its affiliates is still to be supportive of the military organization.

 I feel I would like to perform a service for society. However, any social service I perform should be in a civilian area where I am qualified—namely, psychiatry—and thus can best use my training and skills. It has taken too many valuable years and too much effort, energy, and money to train me for this specific service, for me not to practice psychiatry now.

14. Nature of Beliefs:

 I consider myself a humanist—in the tradition of philosophical humanism. My humanism constitutes a faith in certain values and beliefs which act as the most fundamental guiding principles in my life. In essence, my humanistic faith constitutes my answer to the deep questions about the meaning of human life.

 The basic values and premises of my humanistic faith are the following: a belief that the ultimate value is not a God, but *man* in the here and now; a belief that man is an animal and as such is part of nature; a belief that through his reasoning capacity, man shall be able to resolve his human problems; a belief that social freedom is a prerequisit for individuality and autonomy; and, finally, a belief that men in social collectivities, if they respect and care for each other, must seek to resolve their social conflicts peacefully. Let me further explain what these beliefs mean to me.

 When I say that I believe man, individual men—not God, the state, the majority—is the ultimate good, I mean that, as a humanist, I value highest the individual human life. I believe in the basic inviolate respectability and dignity of each man, and am concerned that all men have the freedom and opportunity to not only survive, but to

explore and develop their independent personalities and talents. Because I conceive of men as basically good and admirable, I believe they are able to strive to perfect themselves through their own efforts. This belief in men's capacity to help themselves is at the foundation of my faith in the future of mankind.

A second element of my humanistic faith is my belief that man, as an animal, is a part of nature—the most superior part that has evolved. Man, I believe, is directed by a universal force that has as its basic attribute, growth, improvement, and evolutionary development. This force has never generated a malevolent living creature, least of all a creature which would deliberately ravage the universe and annihilate all living things, including its own species. Certainly, living things, for their own ultimate survival, may at times do harm to another species, but *only* for their survival. Nor do I believe man is an exception to this rule. Human societies have always understood that killing another human being is immoral. I, however, would add that it is not only immoral, but against the tendencies and drives of the basic universal force which guides and perpetuates life.

My belief in the power of human reason rests ultimately on my conviction that man is a basically "rational animal." That is, men will not act in blatantly non-commonsensical, or illogical ways. I believe that man's capacity for cognition and critical thinking, when combined with compassion and empathy, are capable of guiding his social living. I feel that I must defend the ideal of the prime role of reason in human affairs.

In close relation to my valuation of reason is my belief that social freedom is essential if men are to attain individual independence and excellence. Reason and freedom are connected because a man is free only if he is able to exercise his own reason in the formulation of, as well as deliberation between, available life choices. It is in this activity of formulation and deliberation that men become critical and capable of individually responsible decisions. It is my further conviction that ultimately man's capacity for reasoning can be hindered or encouraged by his society. I believe that a society encourages its members to be independent and responsible when it provides them with social freedom. A man has this social freedom only when he has the unrestricted rights to read, reason, and think as he wishes, and the right to make his own choices about his beliefs and conduct. Of course, no man can be permitted, in his exercise of social freedom, to harm or unjustifiably interfere with other men and their social rights. My concern with social freedom, then, is a concern with those social rights men must have if they are to develop into independently reasoning and responsible human beings.

The final value I mentioned was the belief that if men respect each other, they will seek to resolve their differences via peaceful means. This belief rests upon my conviction that men are social beings and that they are happy only when they belong to human communities and experience human solidarity with others through love, affection, and respect. As social beings today in communication and potential con-

flict with the rest of mankind, I believe men must seek non-violent, just, and compassionate means for resolving their conflicts. For, any means which result in the devastation or destruction of human lives run counter to my ultimate valuation of the individual human being and his absolute right to life.

On the basis of the above outlined beliefs, I maintain that I can never accept as morally desirable or excusable the conscious and volitional taking of (or, for that matter, irrevocable harming of) another human life, be this done by suicide, euthenasia, abortion, capital punishment, or, finally, through war.

Suicide is not an issue for me. In psychiatry, of course, my job is to prevent, under any circumstances, other persons' resorting to suicide. In my work with people I have found that once a depressed person has been removed from his threatening environment, he will realize, as a reasoning person, that his life is, after all, worth living.

Nor can I endorse euthenasia. That is, the case in which people question the worth of another person's life after illness, loss of certain bodily functions, or after mutilation. As a doctor, I have too often witnessed the inner sincere desire and will to live on the part of these so-called worthless people. As for the number of so-called vegetables; many a miraculous transformation or turn of events has taken place with patients such that they recover or are able to live with their afflictions, as evidenced in medical journals or religious literature. Thus, no matter how strongly a patient may want to die, nor how damaged his body may be, I consider it my moral duty to prolong life.

Abortion anytime is also, to my mind, an immoral act because it is the taking away of life from a potentially thriving, happy, viable human being.

Even in the situation of self-defense, I find no moral or ethical justification for one person taking another human being's life. For I do not see what sort of perverse justice would be served by my taking another man's life (or permanently harming him), if he attacked me or attacked and killed members of my immediate family. Certainly, I would be terribly angry and saddened by the event. Nevertheless, I could not in any way *justify* performing the same wrong by volitionally killing this attacker. Some other, non-lethal means must be used to take this man into custody and to restrain him. Similarly, other means than retributive punishment must be devised for dealing with these men, who, I believe, act from "sick," "derranged," or "irrational" motives—and acting as such, reveal themselves to be crippled human beings.

My aversion to capital punishment follows naturally from this aversion to retributive justice. No matter what the crime, I see no way that I or any other reasoning human being can take it upon himself to deliberately kill another man.

I do, however, recognize that there is a need for a civilian police force; for there are times when "psychotic" or "criminal" *individuals,*

who have lost control of their actions, will have to be restrained and temporarily incarcerated until they can be dealt with as "normally reasoning" human beings. Police force, then, and unlike military force, is used against isolated individuals who are often victims of irrational presuppositions. Police force is not designed to be used against total organizations of normal, productive human beings.

I do not regard a civilian police force as relying on the same principles nor pursuing the same ends as a military force. Unlike police forces, which deal against individuals, military activities, to my mind, are directed against organizations of men ("the enemy"), and often result in the destruction en masse of many individually decent human beings and their societies and cultures. Military force, in short, is not meant to deal against individual irrationality and "crime," but with the conflicts and disagreements which arise between large groups of average men and women. Finally, military force relies ultimately on violent means, such as war, in dealing with their opponents. Of course, a police force today also relies on violent means of containing individual "criminals." It is my belief, however, that a civilian police force is both necessary and *can* be organized to rely upon non-lethal weapons and tactics. On the other hand, I believe a military organization, which is necessarily concerned with the use of lethal weapons and tactics against groups of ordinary men and women, would be unnecessary within a social system that relied upon reason and humanity in negotiation.

If we can persuade through reason, as I believe we can, even a "psychotic" not to kill or attack, why can we not do the same with our "enemies" of the state or society? Surely this "enemy" cannot be less reasoning or rational than a psychotic. For this reason, I fear we have made the grave mistake of not exhausting all the more reasonable and rational avenues of approach to the settlement of conflicts on personal, social, and international levels. We have spent billions on a lethal weaponry that can now put an end to all human existence. But we have not spent enough on peaceful, persuasive means of settling differences of opinion.

On the level of international conflicts, the predominant means of negotiation is a form of negotiation which encourages mutual hostility, fear, and defensiveness. Each side feels compelled to look tough to scare the other and as a consequence both sides view their opponents as all evil, irrational enemies. Such absolutistic, negative images lead to gross misinterpretations of each other's motivations, desires, and actions. I believe we must attempt to negotiate not with devil images of our opponents, but with a somewhat emphathic idea of where they are at. (By "empathic" I mean we must attempt to understand that our enemies are individuals like ourselves who are just as frightened and mistrusting of us and our motivations as we are of them and their motivations.) We must attempt not to appeal through threats of sanction, but attempt to appeal to their instincts of rationality, benevolence, and fairness. Naturally, we must ourselves attempt to be tolerant, open, rational,

fair, and benevolent. Thus, it seems to me that we must invest more time, money, effort, and manpower in the researching and developing of better and more appropriate negotiation means, tactics, and logistics. We must become concerned with appealing to and feeding into the positive aspects of man. I feel certain that when such modes of negotiation have been developed and become widespread, and if they are pursued adequately, openly, and non-defensively, they will seldom, if ever, end in a stalemate. In short, resorting to violent warfare will be unnecessary and the rationale for our present military institution will be undermined.

Though a number of aspects of my life would reflect my commitment to humanism, I regard my psychiatric profession as a a particularly direct and natural outgrowth of my humanistic faith. As a psychiatrist I rely on and find support in the theories and forms of therapy advocated by men of the humanistic branch of psychiatric psychotherapy. These psychologists and social scientists include Eric Erikson, Abraham Maslow, David Reisman, Carl Rogers, Rollo May, and Kazimierz Dabrowski. I have been reading these men's works since early medical school and have found that their theories and ideas support and help to crystalize my views on humanism, man's motivations, needs, and capacities.

I hold, with these psychiatrists, psychologists and social scientists, a conception of the basic human condition as individual man alone in the universe facing death and having the need to give meaning and purpose to his transient human life. With them I argue that man's characteristics and potentials are basically "good," that is, non-aggressive, social, and creative. Again, with them I maintain that men may, if their social-physical environment is adequate and non-threatening, live lives of growth toward greater reasonableness, greater depth of emotional experience and creativity. However, if these same men's environment is threatening and hostile, than they will end up living cramped, static and rigid lives. Of course, when men live lives of rationality, tolerance, and trust, they are able to resolve their social conflict in such non-violent ways as I have discussed above.[1]

In my psychiatric work, then, I deal with man as a thinking, feeling, reasoning animal, far superior to all other animals. I, with many

1. Before I continue let me define some of these concepts. By "psychotic" I mean a fairly discrete category of persons who have a specific disorder in their thought process. By "social deviant" I refer to a person whose behavior is defined by the social majority as falling outside their standard of socially normal and acceptable behavior. So-called "neurotic" and non-psychotic "criminal" behaviors fall within this category. By "autonomous man" I refer to a man who strives to control his own life and actions by rational thinking and willingly accepts responsibility for his actions. An autonomous man has a value system in consistency with which he always endeavors to act. The value system of such men are essentially ethical. By a "rational man" I mean a man who endeavors to be critical, consistent, and open in his thinking. A man approximates what I call "non-defensive behavior" when he perceives his interpersonal environment as being essentially non-threatening physically and psychically to him. Finally, by a "non-threatening, non-hostile environment" I mean a social situation which is uniquely perceived by the individual as in no way intending or tending to harm him emotionally or physically.

others in my field, believe that even such everyday items as anti-psychotic drugs and tranquilizers are not necessary in dealing with even the most "disturbed" persons. For, I believe that if these persons' social environment and the important individuals in their lives can be changed such that these individuals become less threatening to these "disturbed" persons, then their behavior will improve because they will come to see that they do not have to act "crazy" or "derranged"—as modes of accommodating—to survive in this new, less threatening environment.

In reference to the "dangerous psychotic," it is generally recognized by psychiatrists that even the most supposedly "derranged" individual will not attack another without provocation. At times this provocation may indeed be minor, as with certain paranoid patients, but even there, the paranoid perceives the provocation as an attack upon himself. These patients' problem with impulse control seems to be more harmful to society than their specific delusional systems. Even these "sick" people can, however, be reasoned with and helped to see things from a more realistic (i. e. normal) perspective. This more realistic perspective will ultimately enable them to gain better control of their impulses so that they can channel their drives and impulses more appropriately for social life.

These, then, are the basic premises and presuppositions I hold, as a psychiatrist, about man. Obviously, they overlap and find expression in the beliefs and values I discussed above as constituting my humanistic faith. Both are man-centered and naturalistic. Both accept man's basic capacity for goodness, creativity and reason. In both is the belief that men, if so encouraged, can deal humanely, reasonably and fairly with each other. A consequence of these beliefs is that it is unnecessary for men in resolving their interpersonal and international conflicts to resort to forceful and violent tactics.

In sum, then, there is no way I can support with a clear conscience an organization or individuals who plan for and carry out the death and devastation that come inevitably with war. For, my personal faith rests upon the ultimate valuing of the individual human life, and upon my conviction that men will, if they are allowed, tend to be reasonable and compassionate in their behavior with each other. My entire training in hospitals and clinics has been directed toward the saving of life. The military, on the other hand, teaches one to kill or to advocate and tolerate killing.

Because military premises are so counter to my feelings and beliefs, I feel I would, if I were a part of that organization, have to speak out against the military perspective constantly, and try to undo their condition, and encourage and support all individuals who would want to leave and/or undermine that institution. Nor, as a member of such an organization, could I fulfill either my personal or professional roles to their utmost. For, for me to do so would put me in constant and open conflict with the ideologies of the system. To not perform these roles, however, would be a great waste of personal productivity that both I and the organization should be concerned to avoid. I feel,

then, that I can best serve our country in an area outside the military where my beliefs and values and those of the agency within which I would be functioning would not be in such harst and dramatic conflict.

### 15. Development of Beliefs:

I shall discuss the development of my humanistic beliefs in terms of my own life experiences. I divide these experiences into the following five phases: War years, McCarthy era, College years, Medical Training years, and Psychiatric Training years. During these years the basic elements of my humanistic faith emerged, developed, and matured. These elements, of course, are: man, naturalism, rationalism, social freedom, and peaceful resolution of conflict.

I was born in Europe during World War II. Despite the havoc of those times, my parents worked hard and eagerly to create as pleasant and safe an environment for me as was possible. During those war years, they discovered that men and women, even under the enormous stresses and burdens of war, are basically decent and kind. Thus, the average wartime civilian and the average soldier were able to transcend even that supposedly most basic of instincts—self-preservation—to help other human beings in trouble. They frequently shared their limited supplies of food, clothing, and shelter with total strangers. Particularly did these men and women come to the aid of helpless children. Among other things, it was not uncommon to see a "brave soldier" in tears at the sight of suffering, maimed, and mutilated human beings. Their responses were one's of warmth and compassion. Nor was this humane attitude restricted to only one national or ethnic group. Rather, under these crisis circumstances, men seemed to perceive and respond to each other—"friend" or "foe" —as human beings. Of course, at times stresses for specific individuals were so great that they acted in defensive and less humane ways. But others often understood their stressful situations and came to accept and sympathise with them.

While I was growing up in America, my parents told me many stories about these war years—often in terms of a moral lesson about the basic decency and ultimate worth of people. For my parents these experiences were a revelation about human nature, and they wanted me to be aware of this human nature and to fully appreciate it throughout my life. And, in fact, in retelling these stories they instilled in me a sense and expectation of this basic decency.

In conclusion, then, my parents were not embittered by their war experience. Rather, they felt pity and sorrow for all the men involved. The greatest crime of war, they felt, was the deliberate and collective attempt by one "side" to harm the other. Ultimately, they began to wonder whether men could learn to appeal to each others' positive sentiments and motives, and thereby resolve non-violently, through negotiation, many of the world's conflicts.

My parents' optimistic, positive conception of man helped us to weather the next major crisis in our lives—the Joseph McCarthy era

of the early 1950's. We were at that time moving into a Levittown house on Long Island. Our Levit house was to be our first house in the suburbs and we wanted very much to fit in and feel wanted. This hope did not quite materialize. For, our neighbors' feelings for us were not what we had hoped for. The McCarthy witch hunts were on. Through constant accusations and insinuations McCarthites appealed to many Americans' fears of foreigners, especially, "the Reds," "the Commies," and, "the Pinkos." Gradually, under the pressure of the times, our neighbors began to fear the "Czubaroffs," for we had a Slavic name and spoke with a strange accent. Because our neighbors were fearful, they acted unhospitably. They closed us totally out of their social gatherings and wrote unkind notes to us. They damaged our property, and intimidated other people who came in contact with us. Thus, for a period of time during the 1950's we were totally isolated from all meaningful outside contact with our neighbors.

Though this experience may sound sad and humiliating, my parents were able to survive the crisis by turning into the family, and by learning from it the value of trying to be an autonomous individual —that is, one who attempts to build and act upon his own belief and value system, with or without public approval. We had temporarily to live a life that we felt was worthwhile and adequate, despite outside disapproval. Meanwhile, my parents, on the basis of their previous experience with people during the war, maintained a faith in the basic decency of man. They believed that once the fear-instilling rhetoric was over, people would perceive that what they had feared was not going to materialize, and that consequently, what they had done to us was neither rational nor humane.

In fact, very shortly after the tide of public opinion turned against McCarthy, our neighbors began to open up to us and see us for what we were. They began to accept us into their community. They observed that we had not retaliated in a defensive fashion of our own, and that we were not, in fact, malicious or threatening people. From this time on we were a part of that community. And, by the time we moved out of the area some neighbors even cried about our departure. Most of them conveyed regret for having done what they did.

My parents taught me many things during this period of personal alienation and isolation from adequate peer relationships. In particular, they emphasised the great value of coming to one's own convictions and faith. They encouraged me to look to myself for approval and not to other people or organizations. Of course, it is always easier to have parents, parent-surrogates, or peers make all one's decisions and evaluations. In the process, however, one loses an opportunity to develop one's capacity to think critically and insightfully. This capacity, in turn, to come to well-thought-out decisions, produces a sense of personal accomplishment and worthiness. Thus, through the development and exercise of my own reasoning capacities, I came to believe that one of the most important capacities we as human beings have is that of free and critical reasoning.

As my personal autonomy developed and my self-confidence grew, I gradually gave up the desire and the need to join groups and organizations, just for the satisfaction of my needs for surrogate parents and authority. I participated in formal organizations after this time; for example, church meetings, intramural sports, fraternaties, political rallies, medical student groups, and antiwar movement gatherings, but I did not believe in becoming a single-minded member. I came to believe that such membership required too much subjugation of my individuality and autonomy.

The next years of my life which had significant influence on the development of my beliefs, were my undergraduate college years. It was during these years that I had my first opportunity to try my opinions on persons from other than my home environment. I had to see if the trust in most men, the morality of "Do unto others as you would have them do unto you," and the ideal of autonomy taught in my home, was applicable and realistic in the outside world. The beliefs I had gained from my parents were affirmed, not only as traditional elements of religious doctrines, but as beliefs credible to critically thinking men.

In particular, it was my experiences with my roommates that substantiated my belief in man's basic decency and trustworthiness. My freshman year roommate in college was a black man from a New York City ghetto. I, as well as all of my friends, accepted him totally. He liked us for what we were and vice versa. He did not act in a pretentious or hostile way and thus evoked no defensiveness in people around him. My sophomore year I had a Chinese roommate and observed the same phenomenon of acceptance and good will. Seeing this happen in such a short time on a college campus over a decate ago affirmed my faith in men's decency toward each other.

Besides these interpersonal discoveries, I found that many campus professors advocated the ideal of individual autonomy. The philosophy of these professors was that one should strive primarily to be a worthy, open-minded and empathic individual, with an internalized sense of adequacy, security, and confidence. They argued that one's behavior toward others should be motivated not by fear or defensiveness, but by sincere liking of the other person as he is, not as he should be or as his credentials say he is.

The academic community also explicitly brought home to me the value of intellectual openness and critical reasoning. In this "safe" ivory tower environment, I witnessed intellectual curiosity and openness among the students and faculty. Most of them were interested not in battling over ideas, but in exchanging and critically examining them. They were at least partly receptive to new and different views and ideas. True, the ivory tower atmosphere did foster this attitude. But, it strikes me that the world would be a decidedly more pleasant place to live in if we could create even a little of this university atmosphere of reason and openness in national and international negotiations and dialogues.

Also while I was in college I began to expose myself to a greater range of religions and religious philosophies. I found that most of the popularly accepted Judeao-Christian religions did not add much to my beliefs. Nor did they increase my insight into the organization of the universe, the role of man in the universe, or the workings of the natural forces that seem to govern both man and the universe. I found that these religions fell back upon too much blind faith.

I did, however, discover that some of the "peripheral" religions offered more to me. They seemed to believe in a spiritual force directing and governing all of man's actions, as well as all of the processes of the universe. For instance, during part of my college years, I attended Christian Science meetings on Sundays to learn more about their conception of "Spirit"—a pervading, positive force that partly coincided with my intuitive feelings and ideas about the order of life and man's place in the universe. Toward the end of my college years I came in contact with a new form of Buddhism and discovered that these Buddhists also believed in a positive force in man and throughout the universe. According to them, this force, if allowed to emerge, can be a very powerful and positive director of man's behavior.

I took away from these experiences with other religions a stronger and more confident belief in a basic force of the universe and its positive influence on man's motives and behavior.

One final observation I have made with regard to my college experiences has to do with the various modes of disagreement, demonstration, and social change resorted to during the last eight years by university students. I have witnessed a swing from the non-violent tactics of dissent and social change we students used during my own undergraduate days, to the violent and irrational tactics of the late 1960's, and, finally, a swing back in the early 1970's to more rational, non-violent, person-respecting tactics. It is my perception that during the late 1960's, when student and faculty radicals resorted to violent, non-rational means of dissent and demonstration, very few enduring and constructive social changes were produced. Today, with a reversion back to more non-violent and rational means, we are beginning to move forward, leaving in the wake of social change fewer hurt, angry, and defensive people.

In sum, then, my university experiences reaffirmed my beliefs about man's basic goodness, reasonableness, and ultimate worth.

During my medical school training and internship I developed an even greater confidence in and appreciation of man as a worthy, compassionate being. Throughout my experiences in medical school, but particularly in the latter two clinical years and internship, when I was personally responsible to the patients and their families, I watched people live and act under conditions and stresses that tested their endurance capacities to the limit. People with various illnesses that left them mutilated, crippled, paralysed, incoherent, and delerious from pain, often emerged from these experiences with a deeper comprehension of life and a greater generosity toward others. Concomi-

tantly, it was heart warming to see how other people would rally to the support of these patients who were essentially stripped naked of their social facades and defenses.

I observed that it was in these hospital circumstances that men acted most openly, sincerely, and benevolently. People from all walks of life, from all socio-economic groups, from various ethnic and religious groups, all reacted the same. The ghetto black was no more maliceful or hostile than the white Christian businessman. All these people needed and wanted help and were appreciative of that which was offered. Certainly, on occasion, we ran across a person who under the stress of personal illness made unreasonable demands and then got angry with the staff when these were not fulfilled. Yet, even in these situations, the problem often was that the staff had provoked a defensive anger in the patient by acting in a somewhat curt and less empathic way than they should have. The staff that did not react antagonistically themselves rarely had this "problem" with "hostile" and "arrogant" patients.

In many ways, the patients' families and friends reinforced my faith in man more than did the patients. For they were always willing to come to the aid of another loved human being. They showed sincere care and concern for the individual. At times they were willing to give up their own organs for their friends or relatives. Many a relative would approach me voluntarily, inquiring if their kidney or blood could be used to help the ill individual. Visitors and friends would even inquire if blood could be donated for another ill individual they saw and felt compassion for on the ward. Then again, it was not unusual for an entire "juvenile gang" to offer to give blood for a fellow brother in trouble or at times even for another black stranger on the ward.

It was also during my last two clinical years in medical school that I first began to get an immediate sense of the horrors of violence, mutilation, and suffering from pain. True, the patients often did emerge from their personal crises as more mature, substantial people, but the human misery they bore was too high a price for this growth. My sense of horror was extended to the war situation that existed in Southeast Asia at the time. Through reading about the violent atrocities, and the human sufferings of the war, and hearing about them directly from medical personnel who had been in South Vietnam, I strengthened my opposition to all violent, harmful confrontation, particularly the intentional, organized violence of war. Of course, I had learned at home, and had always felt that horror and opposition to physical violence and war, but it took my immediate confrontation with human suffering on the hospital wards, and my potential involvement in an actual war situation for my views on the opposition to war to crystallize.

Finally, when my medical school graduation was imminent, I, as did most of my friends, applied for a Berry Plan deferment, in the hope of putting off military service in Vietnam for another four years.

This action, in a way, gave me another four years before I had to seriously confront the conflicts I felt between my own personal beliefs and values and those of the military institution.

Once this four year grace period was assured, and once the academic pressures of medical school diminished, I was able to devote more time, effort, and energy to learning about the Vietnam war in particular, about war and violent confrontation in general, and about the military organization as an independent institution. As I began to think seriously about these issues, I found that my long standing opposition to war extended to a strong repugnance for the whole idea of a military organization.

My conception of the military organization includes all the subsidiary or ancillary government organizations which support and supplement its activities; that is, for example, the Pentagon, the Defense Department, and the CIA. In the few times I have participated in the social activities of members of these activities, I have found these persons to be very inbred—everyone knows, works, and socializes almost exclusively with other members of their organization. These experiences have strengthened my perception that our military and defense organizations are closed systems. This closed characteristic of these organizations includes, as I have noted, the tendency of the members to socialize almost exclusively among themselves. It also includes the demand that on the relevant policy and philosophy issues everyone share the uniform, established doctrine of the organization, and thereby necessarily subjugates the members' critical intelligence in the name of the organization line.

When a person is recruited for any of these organizations, he is indoctrinated with this prevailing organizational policy and philosophy. This indoctrination process has no respect for the ideals of individual reasoning and hard criticism. On the contrary, it punishes the independent and skeptical thinker and actor by labeling him as "unpatriotic," by laterally displacing him to powerless positions within the organization, by firing or dishonorably discharging him, by indicting, prosecuting, and potentially imprisoning him. In turn, these ostracizing powers of the system are used as threats to keep the members uniform and in line. Obviously, this repressive characteristic of these organizations works to subvert my ideal of individual independence and critical thinking.

Finally, this closed characteristic of the military system is morally reprehensible in my mind for two reasons. First, the military generates and perpetuates a distorted perception of a constant threat by an "enemy" to both the individual and the organization. Second, by subordinating the individual critical intelligence and conscience to the organization doctrine, the military encourages moral irresponsibility, apathy, and laxness among its individual members. Very often this tendency to create individual irresponsibility is justified in the name of the "higher" goals of the organization.

Many of my convictions about people and the role of reason in social life were reinforced once I entered psychiatric training. The

basic foundation had obviously been laid over the years preceeding. However, once I started to seriously study the psychiatric literature, for example, the works of Abraham Maslow, Carl Rogers, Rollo May, and Eric Erikson, which I had begun reading back in medical school, I began to see that not only do others feel as I do about man's positive nature and rational capacities, but they also have a better theoretical explanation for his various behaviors than do religious or other philosophical literature. As a psychiatrist I have seen what defensiveness can do to a person and how provocation will be taken by him. I have seen that even the most "deviant" of individuals is nothing more than a fearful, threatened person who protects himself as best as he can. But, I have also seen that this same defensive, "deviant" person will respond with reason and rational thought once placed in a less threatening environment.

I saw this most dramatically with two "juvenile delinquents" who were court-committed to our locked in-patient psychiatry unit. Each of them had a long prison record for repeated minor and grand theft, for repeated assault and battery, and for many other violations of our social code.. The judge sent these two, 15 and 17 year old black youths, for evaluation of their "incorrigibility." When I first saw them, they reacted very hostilly, arrogantly, and uncooperatively. Later, I sat down with each of them and explained why they were there and explained that there was nothing to fear from us. Understandably, they did not initially trust me, but I attempted to be friends with them, and as a result of my efforts, began to witness the emergence of trust in them. I decided to show in tangible terms, and not just words, that I also trusted them. So I took each of them off the ward for cokes in the snack shop and out on the open hospital grounds. I told them that they could run away if they really wanted to, but that I hoped they would not because I would then get in trouble with the courts for letting that happen. They reassured me they would not run away, and, in fact, did not. From then on we went off the grounds daily. As the result of our time together they saw that I was trying to be honest with them.

Finally, one of these young men asked, after several weeks on the ward, to be excused on a. weekend pass to attend his sister's wedding. Passes were, in fact, common for all non-court-committed patients on the ward. In his particular case, however, I had to clear it with the court because he was there under their orders. The judge refused to grant permission. When I told the teenager of the decision, he felt very dejected. That same Friday afternoon, however, he managed to escape from the ward, but only after leaving me a note saying that he would return on Monday. Though my confidence was shaken, it need not have been, for he did, in fact, return that Monday, saying he was sorry, but that he just had to go to his sister's wedding and hoped that I had not gotten into trouble because of him.

From both of these patients I learned that even the most "socially. deviant" individuals can and should be trusted as any other human being. Further, if given this trust, their responses will be more sincere and appropriate.

Perhaps the most important contribution my psychiatric training and experience has made to the development of my personal philosophy is the belief that cognition and reason are the underlying bases for all human behavior. On the basis of this belief, I attempt to deal with and influence people via reasonable discourse—as opposed to other means, such as chemical and behavioral techniques. In line with my faith in men's rational nature and capacity, I have endeavored to effect changes via rational appeals to the people involved. For instance, as a medical student I worked with other medical students through negotiations with the medical school administration to liberalize and individualize part of our medical school curriculum. I was involved with fellow residents in a similar process during the first and second years of my psychiatric training. In this instance we were concerned to improve the caliber of teaching, to get exposure to more diversified psychiatric schools of thought, and overall, to get a greater individuation of the program.

As part of my attempt to effect change through non-violent, rational means, I made a personal television appeal to the people of Philadelphia to get conditions improved in their city hospital. This was during my six months training at that hospital.

During my training rotation a disagreement between the mayor and the hospital was raging. The mayor wanted to get a larger budget from the city council and threatened that without it he could not and would not maintain the city hospital appropriation. It was apparent to me that the city government was playing political football with the hospital by threatening to cut off funds for it. I was so incensed by the already deplorable conditions at Philadelphia General Hospital and by the possibility of further deterioration due to loss of funds, that I felt compelled to do or say something about the situation.

I decided that the best way to help the hospital was to make a direct appeal to the people of Philadelphia. So I called the local television stations and interested some news reporters in doing a story on the conditions at the hospital and the politics being played with the health of at least a quarter of the city's population covered by this hospital. The reporters came down, interviewed me, photographed the physical decay of the hospital, and discussed the many other inadequacies that prevail throughout the institution.

Later and with regard to this same situation, I helped organize a picket of City Hall by the hospital physicians. Again, we hoped thereby to dramatize directly to the people what was going on between the hospital and the mayor. The outcome of all this activity was a settlement of the financial issues concerning the hospital, as well as a settlement of the city hiring policy at the hospital.

In conclusion, even though my humanistic views began to be formed back in the mid-1950's, through my parents' stories about World War II, and through their attitude and my experiences during the McCarthy era, my beliefs were not fully crystallized until my college and medical years. It took contact with critically thinking peers and teachers,

and a number of adult experiences to pull together the various beliefs and experiences on my part into a cohesive and self-conscious philosophy of life, or life faith.

Finally, to those who might question my faith, I add that if I did not have this basic faith in the relationality and decency of men, I could not and would not be in the profession of psychiatry or even medicine. If I did not believe as I do, I would have no reason or purpose for saving individual lives. In fact, if I did not believe in the basic goodness of man, I could have no faith in the individual, in society, in mankind. I, for one, have chosen to believe in man's basic goodness and rationality and thus strongly believe in each man's right to live and think for himself.

16. <u>When and Why Beliefs Became Incompatible with Military Service</u>:

As mentioned earlier in question number 15, it was during my last two clinical years in medical school that I strengthened the opposition I have always felt to all violent confrontation, particularly the organized violence of war. It was during the four year grace period that I had as a result of the Berry Plan deferment that my opposition to violence and war became incompatible with military service in general. I have two basic reasons for my opposition to the military organization and to service in it. These are, that the military organization is a closed system, a point upon which I have elaborated upon in question number 15, and that it generates and perpetuates a distorted perception of conflict situations.

With regard to this second point, it is my conviction that all military organizations, including that of the United States, generate and perpetuate a distorted perception of world conflict situations as being between "enemies" and "friends," when, in fact, conflict situations need not be thus perceived. For I strongly believe that if we gave rational-humane negotiation a chance and curtailed the threat-ideology of these military organizations, we could peacefully resolve our national and international conflicts.

This conviction about man's rationality has grown as a consequence of my psychiatric training and experience. For it rests on my strengthened faith in man's reasoning capacities and therefore on mankind's ability to resort successfully to rational means of conflict resolution.

My psychiatric training has also convinced me that the enemy-friend-threat perspective is unnecessary and destructive. Occasionally, some social environments are genuinely and inevitably threatening. For instance, the situation of direct bodily attack which may require restraining force. However, most often the social environments need not be directly threatening, or, if there is a threat element, it is not of a degree which justifies the use of force. I believe most conflict situations, including international conflicts, are of this second type of unnecessary threat situation. This belief is based on my conviction that men are taught to perceive abstract social enemies which, in fact, do not present direct threats to them. Were men not taught

to perceive abstract enemies, I believe they would perceive, instead, men like themselves who wish to resolve their conflicts with the least social cost and with minimal use of force. In short, I believe that in all conflict situations, men can be taught to see that the people with whom they conflict are capable of rational cooperation and are likely to desire a non-violent and fair resolution of their conflict.

### 17. Circumstances which Justify the Use of Force:

I believe in using the least destructive force possible—but a force that is never lethal or mutilative—to restrain *individuals* who have temporarily been swayed from their basically humane and reasonable tendencies. The persons who may be thus restrained include "psychotics" and "anti-social deviants"—men who could be of harm to others or to themselves. Such men should be restrained, confined, and allowed, in a non-threatening environment, to let their more humane, less defensive selves emerge.

This position recognizes the necessity for a non-violent civilian police force, while it does not condone the violent means and goals of the military. Police force deals with the "psychotic" or "anti-social deviants" cited above. That is, it is used against isolated individuals, not against total organizations of normal, productive human beings. Military force, on the other hand, is not meant to deal against individual irrationality and "crime," but with the conflicts and disagreements which arise between large groups of average men and women. It is my belief, of course, that rational and humane negotiations between average men and women would alleviate any need for military means of conflict resolution. Therefore, any resort to force against such organizations of men should be unnecessary as well as immoral.

Of course, a police force today relies on violent means of containing individual "criminals." It is my belief, however, that a civilian police force is both necessary and *can* be organized to rely upon non-lethal weapons and tactics. I believe we all agree that the purpose of a revolver or rifle in a police officer's hand is to protect himself and to restrain the "criminal" or "social deviant," not to kill or harm the individual "criminal" or "social deviant." These two purposes of self-protection and restraint could be, however, just as well served by non-violent, non-lethal weapons.

My argument is that while we have spent billions on lethal weapons, we have not spent enough on other means of restraining or influencing people. By restraining weaponry I refer to such things as tranquilizer "guns" and stun "guns"—that is, instruments that will temporarily immobilize or incapacitate the individual attacker or attackers to allow the police agent to control and restrain him (or them). Finally, I believe that in societies which relied upon non-lethal weapons, very little could be gained by resort to these weapons as a means of conflict resolution. They would thus in practice be reserved for controlling momentary outbursts of irrational behavior on the part of individuals.

18. Life Style Change:

My life style has changed to the degree that prior to the explicit working out of my humanistic faith, I dealt with men both in a humanistic and mechanistic fashion. Now, however, and as a consequence of my psychiatric training and experience, I am convinced that men are "ends in themselves" and should be dealt with rationally and non-violently. This I now do on a daily basis as a human being and as a psychiatrist.

Concrete examples of how my life has changed as a consequence of these beliefs are instances of my more active involvement in rational methods of social change. For instance, (a) I believe in actively supporting anti-war candidates for major political offices by distributing literature, attending rallies, and by recruiting support for grass roots committees. (b) I went on television in Philadelphia, 1971, to get city-wide support for improvement of Philadelphia General Hospital facilities at a time when the city wanted to cut the budget. I helped organize a picket of City Hall for the same cause. (c) I worked with a fellow psychiatry resident to write up and run off a 25 page questionaire evaluating and criticising our first year residency program. After collecting and collating this data, we submitted it to the head of the department. Subsequently, the administrative heads in the department began discussion with the two of us of the criticisms and then began activation of a number of the proposed reforms. ·

In the future I shall support legislation against violent weaponry, I shall support the ideals and goals of the United Nations and other organizations devoted to establishing peace in the world by non-violent, rational means, and, in general, I shall support and work in behalf of policies which reflect my convictions. Perhaps of paramount importance, however, is the fact that I shall continue to be, on a daily basis, a humanistic psychiatrist, committed to helping people deal with their life problems in mature and rational ways.

19. Demonstration of Consistency and Depth of Beliefs:

I feel that the most significant evidential support for my convictions is my career choice, psychiatry, a field that shares my feelings and convictions about men. Medicine is in and of itself, a very optimistic and life-supporting profession, while psychiatry is probably the most humanistic of all the medical subspecialities. Psychiatry enables me to help people grow on the most basic psychic and physical levels. It enables me to help a man's better side emerge and function throughout his daily life, despite occasional obstacles and threats.

20. Past Member of any Military Organizations? NO.

21. Member of Religious Sect or Organization? No.

I cannot say that I now turn to any single person or social organization for religious-ethical guidance. I did in the past turn to my parents for guidance. It was, however, their conviction that I must

rely as much as possible on my own thinking. Their conviction, and now mine, of course, rests on the assumptions that significant moral dependence upon outside authorities weakens one's ability and desire to think through beliefs and ideas, act upon them, and take responsibility for them.

Religions and theologians have been of some help to me in coming to my present faith, but so too have natural and social science and their investigators. I have read and attended many diverse religious meetings and discussions, not as a full member of the church, but as an interested observer and potential student of their teachings. Nevertheless, I have not yet come across a single religious philosophy that I totally agree with and thus I feel I cannot, in all fairness to the various religious organizations I have explored, or to myself, become a member.

For answers to the truly fundamental questions of existence, purpose, and the direction of life in the universe, I have always been encouraged by my parents to turn to the learned men of the past and present. The work of contemporary scholars like Abraham Maslow, Rollo May, and Carl Rogers have been of greater value and assistance to me in pulling together my own thoughts about various aspects of the humanistic faith and life philosophy, than has any specific individual, or religious text. Of course, I could argue, conversely, that all the people I have ever come in contact with have helped me to formulate my beliefs. For, it was their actions and attitudes that first started me thinking along the lines of the basic goodness and adequacy of men.

22. Membership in Other Organizations: None

23. Letters of Reference: Attached are six letters written by the following individuals:

1. Mr. S. Bergquist
2. Dr. R. Gold
3. Dr. R. Haschemeyer
4. Dr. R. Isler
5. Mr. C. Kallander
6. Dr. W. Rieger